J-A12026-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAIVON MANSFIELD THOMAS | : | |
| | : | |
| Appellant | : | No. 3050 EDA 2017 |

Appeal from the Judgment of Sentence September 5, 2017
In the Court of Common Pleas of Chester County
Criminal Division at No(s): CP-15-CR-0003484-2016

BEFORE: BOWES, J., OTT, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OTT, J.: **FILED SEPTEMBER 07, 2018**

Jaivon Mansfield Thomas appeals from the judgment of sentence imposed September 5, 2017, in the Chester County Court of Common Pleas. The trial court sentenced Thomas to a term of four to 10 years' imprisonment, followed by seven years' probation, after he was convicted of two violations of the Uniform Firearms Act, 18 Pa.C.S. § 6101 *et seq*. On appeal, Thomas challenges the trial court's denial of his pretrial motion to suppress evidence obtained following a vehicle stop, and the sufficiency of the evidence supporting his convictions. For the reasons below, we affirm.

We have gleaned the following pertinent facts from the testimony presented during Thomas's suppression hearing. On August 23, 2016, at approximately 1:15 a.m., Police Officer John Bogan was patrolling the parking lot of the Turkey Hill minimart located at Routes 340 and 82 in Coatesville, Pennsylvania. He observed a black Kia Sportage, that appeared to be broken

down, receiving a jump from another patron. Thomas was the front seat passenger in the Kia. Officer Bogan described his observations as follows:

> What drew my attention to [Thomas], like I said, I was canvassing the parking lot. And when I came cross them, he looked at me and then he appeared to be turning his body intentionally in the opposite direction away from me. At times he would take part of his clothing, pull it over his face and look back to me to see if I am taking notice to it.
>
> At some point, he said something to the rear seat passenger. And at that time, the rear seat passenger exited the vehicle and stood directly in my line of sight between [Thomas] and where I was positioned.

N.T. 2/14/2017, at 29-30. Officer Bogan explained he thought Thomas's behavior was "very suspicious," like Thomas was "intentionally trying to hide his identity or something." *Id.* at 31. Consequently, when the Kia left the parking lot shortly thereafter and proceeded southbound on Route 82, the officer followed in his patrol vehicle.

Officer Bogan observed the driver activate his right turn signal about 20 feet prior to Wagontown Road, but then fail to turn right. He testified that the Kia then activated the left turn signal "proceeded to cut across the roadway" from the right lane to the left lane, and then turn left into the parking lot of a closed gas station. *Id.* at 33. Officer Bogan pulled in behind the vehicle and activated his emergency lights. He explained he did so based on "[t]he behavior at the Turkey Hill," as well as the driver's failure to signal his turn for 100 feet. *Id.* at 35. At that point, the driver of the Kia "accelerated the vehicle at a high rate of speed and fled" from the parking lot. *Id.*

Detective Jonathan Shave also testified at the suppression hearing, and the Commonwealth introduced video from his vehicle's mobile recording device.  At the time of the incident, Detective Shave was a patrol corporal, and was responding to a radio call from Officer Brogan regarding suspicious activity at the Turkey Hill.  *See id.* at 7.  As he drove northbound on Route 82 towards the minimart, he observed Officer Bogan's vehicle traveling southbound.  Therefore, Detective Shave made a U-turn and proceeded southbound, approximately a quarter mile behind Officer Bogan.  *See id.* at 8.  The detective corroborated Officer Bogan's testimony that the driver of the Kia activated the right turn signal, failed to turn right, and then activated the left turn signal from the right lane.  *See id.* at 9-10.  Detective Shave described what he observed as follows:

> The vehicle then turned its driver side … turn signal on.  It cut into the second lane.  It then cut over into the northbound lane and pulled into the Shell gas station.
>
> * * * *
>
> It appeared from the distance I was, it appeared to be, the turn signal was activated, the car entered into the left lane, and then just continued on and entered into the oncoming lane and into the parking lot.  It appeared to be fluid.  There was no time in the left lane it appeared.

*Id.* at 10-11.  Detective Shave testified the left turn signal was activated for "less than a hundred feet" before it turned into the gas station lot.[1]  *Id.* at 11.

---

[1] Under cross-examination, when presented with Google map printouts indicating the distance between Wagontown Road and the gas station, Detective Shave acknowledged he was "approximately a quarter mile behind

After the driver of the Kia sped out of the gas station parking lot, he fled on Route 82, made a left turn onto Wagontown Road, and continued through a residential area until he struck a curb or embankment and the car became disabled. *See id.* at 13, 35. When the vehicle came to a stop, all three occupants fled on foot. Officer Bogan pursued both the driver and Thomas, who fled in the same direction. While in pursuit, the officer observed Thomas "reaching into his waistband struggling to move an object." *Id.* at 37. Just before Officer Bogan took Thomas into custody, he saw Thomas "throw an object that he retrieved from his waistband." *Id.* The officer shined his flashlight in the area where the object was thrown, approximately 10 to 15 feet from where he apprehended Thomas, and discovered a loaded firearm.

Thomas was arrested and charged with persons not to possess firearms, possession of a firearm without a license, receiving stolen property, flight to avoid apprehension, resisting arrest, tampering with evidence, and recklessly endangering another person.[2] On January 31, 2017, he filed a pretrial motion

_____

the [Kia], and [did not] know the speed that the vehicle was traveling at." N.T., 2/14/2017, at 21. Although he noted it "appeared to be [travelling] very quick," he was unable to state with "exact certainty as to whether or not [the signal was activated for one] hundred feet." *Id.* (acknowledging "[i]t could have been more than a hundred feet").

[2] 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), 3925(a), 5126(a), 5104, 4910(1), and 2705, respectively.

to suppress, *inter alia*, the evidence recovered during the car stop. Following a hearing, the trial court denied the suppression motion on February 17, 2017.

The case proceeded to a bench trial, after which Thomas was found guilty of persons not to possess firearms and possession of a firearm without a license.[3] On September 5, 2017, the trial court sentenced Thomas to a term of four to 10 years' imprisonment for persons not to possess firearms, and a consecutive term of seven years' probation for possession of a firearm without a license. This timely appeal followed.[4]

In his first issue on appeal, Thomas contends the trial court erred in denying his pretrial suppression motion. Our review of an order denying a motion to suppress evidence is well-settled:

> [W]e must determine whether the trial court's factual findings are supported by the evidence of record. If the evidence supports the trial court's findings, we are bound by them and may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Slattery*, 139 A.3d 221, 222 (Pa. Super. 2016). Moreover, "our scope of review is limited to the evidence presented at the suppression hearing." *Commonwealth v. Caple*, 121 A.3d 511, 517 (Pa. Super. 2015) (citation omitted), *appeal denied*, 179 A.3d 7 (Pa. 2018).

---

[3] The Commonwealth *nolle prossed* the remaining charges.

[4] On September 20, 2017, the trial court ordered Thomas to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Thomas complied with the court's directive, and filed a concise statement on September 27, 2017. The trial court then issued an opinion on October 4, 2017.

Thomas's challenge to the court's suppression ruling is two-fold. First, he insists Officer Bogan did not have probable cause to initiate a traffic stop based on a violation of the Motor Vehicle Code. *See* Thomas's Brief at 12. He maintains the court's factual finding, that the driver of the Kia activated his left turn signal less than 100 feet before turning into the gas station, was not supported by the record. *See id.* at 14-19. Second, Thomas contends the gun recovered during the officer's subsequent pursuit must be suppressed as either fruit of the poisonous tree (based on the illegal stop), or coerced abandonment. *See id.* at 20-23.

The trial court found Officer Bogan had probable cause to stop the Kia based upon the driver's violation of Section 3334 of the Motor Vehicle Code. *See* Trial Court Opinion, 2/17/2017, at 3-4, *citing* 75 Pa.C.S. § 3334(b). Additionally, the court determined that after the driver of the Kia sped off, "additional probable cause existed for the second in time stop." *Id.* at 4. Therefore, the trial court concluded Officer Bogan legally seized the gun after Thomas abandoned it. *See id.* at 4-5.

Pursuant to Section 6308(b) of the Motor Vehicle Code, a police officer may stop a vehicle

> [w]henever [he] ... has reasonable suspicion that a violation of [the Motor Vehicle Code] is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicles registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S. § 6308(b). This Court has explained a stop based on mere reasonable suspicion must "serve an investigatory purpose relevant to the suspected violation." *Commonwealth v. Salter*, 121 A.3d 987 (Pa. Super. 2017) (quotation omitted).

> However, if the violation is such that it requires no additional investigation, the officer must have probable cause to initiate the stop. *Commonwealth v. Feczko*, 10 A.3d 1285, 1291 (Pa. Super. 2010).
>
>> Put another way, if the officer has a legitimate expectation of investigatory results, the existence of reasonable suspicion will allow the stop—if the officer has no such expectations of learning additional relevant information concerning the suspected criminal activity, the stop cannot be constitutionally permitted on the basis of mere suspicion.
>
> *Commonwealth v. Chase*, 599 Pa. 80, 960 A.2d 108, 115 (2008).

*Commonwealth v. Brown*, 64 A.3d 1101, 1105 (Pa. Super. 2013), *appeal denied*, 79 A.3d 1096 (Pa. 2013).

Here, it is undisputed that Officer Bogan needed probable cause to stop the Kia based on a violation of Section 3334(b) of the Motor Vehicle Code. That section, which requires drivers to signal before turning, provides, in relevant part:

> (b) Signals on turning and starting.--At speeds of less than 35 miles per hour, an appropriate signal of intention to turn right or left shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning. The signal shall be given during not less than the last 300 feet at speeds in excess of 35 miles per hour. The signal shall also be given prior to entry of the vehicle into the traffic stream from a parked position.

75 Pa.C.S. § 3334(b).  In the present case, the trial court implicitly found the Kia was travelling at a speed of less than 35 miles per hour prior to turning left into the gas station, and was, therefore, required to activate a turn signal for not less than 100 feet before turning.[5]  *See* Trial Court Opinion, 2/17/2017, at 3.  Relying on Officer Bogan's testimony that the left turn signal was activated for less than the required 100 feet, the trial court concluded the officer had probable cause to stop the Kia for the violation.[6]  *See id.* at 3-4.

Thomas argues, however, the officer's testimony was contradicted by the evidence of record.  *See* Thomas's Brief at 14-19.  During the suppression hearing, the Commonwealth introduced the mobile video recording of the incident taken from Detective Shave's vehicle, and Thomas presented Google Maps printouts, which denoted the distances from the right turn at Wagontown Road, that the Kia neglected to make, to the gas station.  However, the trial court discounted the relevancy of these pieces of evidence, concluding:

> [The video recording] clearly shows the left turn signal blinking. What it does not show is the distance travelled from the time it was turned on until the left turn was made.  [The maps] show the

---

[5] The Commonwealth does not dispute this finding.  *See* Commonwealth's Brief at 15-19.

[6] Based on our review of the testimony from the suppression hearing, Officer Bogan did not specifically testify that the driver of the Kia turned left into the gas station less than one hundred feet after activating his signal.  *See* N.T., 2/14/2017, at 32-34.  Rather, he simply indicated he initiated the traffic stop based, in part, upon a turn signal violation.  *See id.* at 35.  Nevertheless, Detective Shave testified on direct examination that the left turn signal was activated for less than 100 feet.  *See id.* at 11.

> area in question which covers more than the required minimum 100 feet to signal a turn. However, neither [] are helpful to the court in deciding the exact point (distance) at which the signal was activated.

Trial Court Opinion, 2/17/2017, at 3. Accordingly, the court accepted the testimony of the officers that the driver of the Kia did not activate his left signal for the mandated time period.[7]

This Court has held a mobile video recording made part of the certified record, may, in rare cases, contradict a trial court's factual findings that are based on credibility determinations. *See Comonwealth. v. Griffin*, 116 A.3d 1139, 1143 (Pa. Super. 2015) (reversing trial court order denying motion to suppress drugs; concluding trial court's factual finding that drugs recovered from defendant's pocket were "immediately apparent" during frisk was contradicted by dash cam video that "clearly depicts the officer repeatedly manipulating [defendant's] pocket"). In the present case, however, our review of the mobile video recording does not lead to the same result. Indeed, the video does not so clearly contradict the officers' testimony as to compel

_____

[7] We recognize Detective Shave acknowledged on cross-examination that he could not calculate the distance the vehicle traveled with the left turn signal activated. *See supra* at n.1. Nevertheless, both Detective Shave and Officer Bogan testified the Kia activated its left signal while in the right lane, cut across the left lane, and very quickly turned into the gas station lot. *See* N.T., 2/14/2017, at 10-11, 33. Further, the trial court was able to view the mobile video recording of the incident from Detective Shave's vehicle. Based upon the testimony and evidence presented by the Commonwealth, the court found Officer Bogan had **probable cause** to believe the driver of the Kia violated Section 3334(b). While the evidence may not have been sufficient to convict Thomas of the Vehicle Code violation, probable cause to stop a vehicle is a lesser standard than beyond a reasonable doubt. Indeed, an officer is not required to measure distance before initiating a traffic stop.

us to reject the trial court's credibility determination. Further, as the trial court noted in its opinion, the maps introduced into evidence do not depict where the left signal was first activated, or where the Kia made the left turn into the gas station. Consequently, we are precluded from considering the mathematical calculations of speed and distance that Thomas presents in his brief. Restricting our review to the suppression hearing, as we are required to do, we find no basis to overturn the trial court's determination that Officer Bogan had probable cause to stop the Kia for a violation of Section 3334(b).

The trial court also found, however, that "[o]nce the driver of [the Kia] sped off, additional probable cause existed for the second in time stop." Trial Court Opinion, 2/17/2017, at 4. We agree.[8] Even assuming, *arguendo*, Officer Bogan did not have probable cause to stop the Kia for the turn signal violation, after he pulled in behind the vehicle and activated his emergency lights, the driver of the Kia accelerated at a high rate of speed out of the parking lot, and through a nearby neighborhood. *See* N.T., 2/14/2017, at 36 (Officer Bogan estimated he had to drive about "50 miles per hour" to catch up to the Kia, in a 25-mile-per-hour speed zone). At that point, the officer

_____

[8] The trial court's opinion is unclear as to the basis for this ruling. In its conclusions of law, the court merely stated: "Vehicle stop number two was lawful as a continuation of the initial stop." Trial Court Opinion, 2/17/2017, at 5. Nonetheless, while our basis for upholding the legality of the second stop may be different than that of the trial court, we emphasize "an appellate court is not bound by the rationale of the trial court and may affirm on any basis if the record supports it." *Commonwealth v. Diaz*, 183 A.3d 417, 421 (Pa. Super. 2018).

had both probable cause to stop the Kia for a speeding violation, **and** reasonable suspicion to conduct a stop based on repeated suspicious behavior. Indeed, by the time Officer Bogan pursued Thomas and the driver on foot, he had observed: (1) suspicious behavior at the Turkey Hill, where it appeared Thomas was attempting to shield his identity from police; (2) the driver of the Kia preparing to turn right, only to cut across two lanes to make a left turn into a closed gas station parking lot; (3) the driver accelerating out of the lot at a high rate of speed after the officer pulled in behind him; (4) the driver leading police on a short high speed chase; and (5) all three occupants of the vehicle fleeing when the car became disabled. Based on the above, Officer Bogan had reasonable suspicion that the occupants of the vehicle were engaging in criminal activity in order to justify a vehicle stop. Accordingly, he was lawfully in pursuit of both Thomas and the driver of the Kia when he observed Thomas discard an object from his waistband, and we agree Thomas's abandonment of the gun was not coerced by unlawful police conduct. **See Commonwealth v. Byrd**, 987 A.2d 786, 791 (Pa. Super. 2009) ("Although abandoned property may normally be obtained and used for evidentiary purposes by the police, such property may not be utilized where the abandonment is coerced by unlawful police action.") (quotation omitted).

Furthermore, we disagree with Thomas's contention that "[t]he facts of this case are nearly identical" to those in the Pennsylvania Supreme Court's recent decision in **Commonwealth v. Shabezz**, 166 A.3d 278 (Pa. 2017). Thomas's Brief at 22. In **Shabezz**, the defendant was a passenger in a

- 11 -

vehicle that was under surveillance for drug sales. ***See Shabezz***, ***supra***, 166 A.3d at 281-282. The officers conducted a vehicle stop, at which time the defendant fled on foot. ***See id.*** at 282. The officers pursued and apprehended him, recovered drugs and cash from his person, and eventually found more drugs and a handgun in the vehicle. ***See id.*** The trial court granted the defendant's motion to suppress all physical evidence, finding, *inter alia*, the officers' testimony regarding the alleged drug transaction they witnessed prior to the stop was not credible, and, therefore, the officers "lacked any constitutionally justifiable basis to stop the vehicle[.]" ***Id.*** at 283.

On appeal to this Court, the Commonwealth argued (1) the defendant did not have an expectation of privacy in the areas of the vehicle that were searched, and (2) the court's factual findings were not supported by the evidence. ***See id.*** A panel of this Court affirmed the trial court's suppression ruling, finding both the stop was illegal and "all of the occupants had standing to challenge the constitutionality of the vehicle stop." ***Id.*** at 284.

Thereafter, the Supreme Court granted an appeal on a narrow issue: "Does the Fourth Amendment entitle a defendant to suppress the fruits of a search where it is undisputed that he had no privacy interest in the car searched?" ***Id.*** at 284. The Court explained:

> It is critical first to underscore what is not at issue in this case. We are not weighing the correctness of the trial court's factual findings. Nor are we assessing that court's determination that the vehicle stop was unconstitutional. Moreover, we are not reviewing the validity of the Superior Court's affirmance of those particular holdings. **For purposes of this appeal, we accept that the stop was unconstitutional**, and we limit our focus to

- 12 -

the question upon which we granted *allocatur*. We inquire whether, following an unconstitutional vehicle stop, the Fourth Amendment requires a passenger to demonstrate a reasonable expectation of privacy in those areas of the vehicle that are searched and that yield incriminating evidence, or whether that evidence automatically is suppressible as fruit of the poisonous tree, regardless of the presence or absence of an expectation of privacy?

***Commonwealth v. Shabezz***, 166 A.3d 278, 284-285 (Pa. 2017) (footnote omitted). The Supreme Court ultimately held the subject of an illegal seizure need not demonstrate a reasonable expectation of privacy in the areas searched to prove a violation of the Fourth Amendment. ***See id.*** at 290. Further, applying the fruit of the poisonous tree doctrine, the Court concluded the search of the vehicle was an "'exploitation' of the constitutional violation[,]" *i.e.*, the vehicle stop, and, the defendant's brief flight from the scene was "insufficient to purge the taint of the initial illegality." ***Id.*** Accordingly, the Supreme Court affirmed the suppression of the evidence.

We emphasize that the Supreme Court in ***Shabezz*** did not consider the legality of the initial stop. Indeed, the Court accepted the determination of the trial court that the stop was unconstitutional. ***See id.*** at 284. Furthermore, in that case, the defendant did not abandon evidence while fleeing from police. Rather, the focus of the Court's inquiry was whether the search of the vehicle, in which the defendant was a passenger, was derivative of the illegal stop, and if so, whether the defendant had to demonstrate a reasonable expectation of privacy in the vehicle to justify suppression of the evidence.

- 13 -

Conversely, in the present case, we have concluded both the initial stop at the gas station lot, and the later stop following the high speed chase, were lawful. Those facts alone distinguish this case from **Shabezz**. Furthermore, here, Officer Bogan observed Thomas pull an object from his waistband and discard it as he fled from police. Thereafter, a firearm was recovered in the area where the item was discarded. Thomas's convictions were based on his possession of that firearm, not on any evidence recovered from the Kia. Accordingly, we conclude the Supreme Court's decision in **Shabezz** is clearly distinguishable, and Thomas's first issue fails.[9]

Next, Thomas argues the evidence presented by the Commonwealth was insufficient to support his convictions. Our standard of review of sufficiency claims is well-settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The

---

[9] Because we conclude (1) the initial stop was supported by probable cause, and, (2) the driver's attempt to evade police by fleeing at a high rate of speed provided additional support for the subsequent chase, we need not address Thomas's argument suppression of the firearm was warranted as fruit of the poisonous tree or coerced abandonment.

Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Estepp*, 17 A.3d 939, 943–44 (Pa. Super. 2011) (citing *Commonwealth v. Brooks*, 7 A.3d 852, 856–57 (Pa. Super. 2010)). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." (*Commonwealth v. Sanders*, 426 Pa.Super. 362, 627 A.2d 183, 185 (1993)). "Although a conviction must be based on 'more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty.'" *Commonwealth v. Gainer*, 7 A.3d 291, 292 (Pa. Super. 2010) (quoting *Commonwealth v. Badman*, 398 Pa.Super. 315, 580 A.2d 1367, 1372 (1990)).

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014).

Here, Thomas was convicted of persons not to possess firearms, and possession of a firearm without a license. *See* 18 Pa.C.S. §§ 6105(a)(1) and 6106. He only challenges the "possession" element of those convictions. Indeed, Thomas insists the evidence was insufficient "to support a finding that [Thomas] possessed the firearm retrieved by Officer Bogan[.]" Thomas's Brief at 23. His entire argument on this issue consists of the following paragraph:

While Officer Bogan testified that he saw [Thomas] reach into his waistband, and throw an object while running, he was unable to identify the object that was thrown, and was unable to describe the shape or size of the object. Although Officer Bogan was able to locate a Glock 23 semi-automatic handgun in the vicinity of where [Thomas] was taken into custody, the handgun was processed and tested, and no DNA, fingerprints, or identifying

information for [Thomas was] found on the gun at all. No further evidence linking the firearm to [Thomas] was presented at trial. Consequently, the element of possession as never established by the Commonwealth, and the Trial Court should have entered a verdict of not guilty.

Thomas's Brief at 24 (record citations omitted).

In rejecting Thomas's claim, the trial court opined:

The objective evidence is that [the firearm] was recovered in close proximity to [Thomas]. Officer Bogan testified that he saw [Thomas] remove something from his waist area, throw it and that when he went to the area where the object had been thrown he recovered [the firearm]. Detective Shave testified that no other contraband was recovered in proximity to [Thomas].

How to explain the presence of the gun? The idea that a fully loaded handgun [] was left on the ground in plain view to be found by anyone in the area is not a viable explanation. A viable explanation is that the unseen object thrown by [Thomas] was the handgun recovered by Officer Bogan from the very area where he observed something to be thrown. I was and am satisfied beyond a reasonable doubt that the Commonwealth proved [Thomas] was in possession of [the firearm].

Trial Court Opinion, 10/4/2017, at unnumbered 2.

We find no error or abuse of discretion in the trial court's ruling. Officer Bogan's testimony – that he observed Thomas throw something during the pursuit and, immediately thereafter, recovered a loaded firearm in the area where the object was thrown – was, if found credible by the trial court, itself sufficient to support the verdict. Indeed, Thomas provides no authority for his assertion that possession cannot be established absent fingerprint or DNA evidence.[10] Thomas's argument more appropriately focuses on the credibility,

---

[10] Indeed, we note there was also no evidence presented that the fingerprints or DNA of either of the two other fleeing suspects was recovered from the firearm.

or lack thereof, of Officer Bogan's testimony, which constitutes a challenge to the weight of the evidence. However, because Thomas did not raise a weight of the evidence claim either before, during or after sentencing, it is waived on appeal. *See* Pa.R.Crim.P. 607(A). Accordingly, Thomas is entitled to no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/7/18